<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1917

                 COMMONWEALTH OF MASSACHUSETTS
              BY ITS DIVISION OF MARINE FISHERIES,

                      Plaintiff, Appellee,

                               v.

           WILLIAM M. DALEY, IN HIS OFFICIAL CAPACITY
         AS SECRETARY OF COMMERCE OF THE UNITED STATES;
            JAMES BAKER, IN HIS OFFICIAL CAPACITY AS
           UNDER SECRETARY AND ADMINISTRATOR FOR THE
        NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION;
      THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION;
        ROLAND A. SCHMITTEN, IN HIS OFFICIAL CAPACITY AS
       DIRECTOR OF THE NATIONAL MARINE FISHERIES SERVICE;
               AND THE UNITED STATES OF AMERICA,

                    Defendants, Appellants.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

          [Hon. Joseph L. Tauro, U.S. District Judge]

                             Before

                    Boudin, Circuit Judge,
                                
Campbell, Senior Circuit Judge ,
                                
                  and Lipez, Circuit Judge.
                                
                                

    Robert L. Klarquist, Attorney, Department of Justice,
Environment & Natural Resources Division, with whom Lois J.
Schiffer, United States Assistant Attorney General, Donald K.
Stern, United States Attorney, John A. Capin, Assistant United
States Attorney, Andrew C. Mergen, Attorney, Department of Justice,
Environment & Natural Resources Division, and Joel G. MacDonaldwere on brief for appellants.

    Daniel J. Hammond, Assistant Attorney General, Commonwealth of
Massachusetts, with whom Scott Harshbarger, Attorney General,
Commonwealth of Massachusetts, was on brief for appellees.

February 24, 1999

                               

 BOUDIN, Circuit Judge.  The Commonwealth of Massachusetts
("the Commonwealth") brought this action in the district court to
review a decision of the Secretary of Commerce ("the Secretary")
adopting a revised  quota for catching scup off the East Coast of
the United States.  The district court held the quota unlawful
insofar as it allocated  the summer catch of scup on a state-by-
state basis.  The Secretary now appeals.
 Scup, also known as porgy, are small migrating fish that
school off the Atlantic coast from North Carolina to Massachusetts.  
In the winter, they swim off-shore from New Jersey southward and
are fished primarily with big trawlers in the ocean; in the summer,
they migrate northward and swim closer inshore to spawn; at the
northern end of the range (Massachusetts, Rhode Island, New York),
much of the commercial catching of scup is done inshore with
smaller vessels, weirs, and pots.
 It is common ground that scup stocks are seriously
depleted.  For this reason, in March 1996, the National Marine
Fisheries Service ("the Fisheries Service"), an agency within the
Commerce Department, issued emergency regulations to govern scup
fishing within the exclusive  economic zone or "EEZ."  The EEZ,
created by the Magnuson-Stevens Act, 16 U.S.C.  1801, et seq.,
extends 200 nautical miles offshore of the United States; within
its borders, the federal government claims exclusive  management of
resources, see id.  1811.  Landward, the zone ends at state
boundaries, see id., which, on the East Coast, are three nautical
miles offshore.
    Emergency regulations bypass the  ordinary scheme of the
Magnuson-Stevens Act, a scheme that depends upon management of EEZ
fisheries through Regional Fishery Management Councils comprising
state representatives.  See 16 U.S.C.  1852-54, 1855.  Such
Councils  propose conservation measures--called fishery management
plans or "FMPs"--for fisheries under their jurisdiction and submit
the FMPs to the Fisheries Service, which may then adopt them
through notice and comment rulemaking.  Id.  1853-54.  The
measures must comply with certain national standards set forth in
the statute and are subject to judicial review in the district
courts.
    Although the Magnuson-Stevens Act does not govern fishing
in state waters, save for statutory exceptions not invoked in this
case, 16 U.S.C.  1856(b), (c), state-waters fishing is subject to
the Atlantic Coastal Fisheries Cooperative Management Act adopted
in 1993, 16 U.S.C.  5101 et seq.  The East Coast states
participate through the Atlantic States Marine Fisheries Commission
("the Atlantic Commission"), which prepares coastal fishery
management plans or "CFMPs"; the plans do not require separate
federal approval but the states themselves are required to enforce
them, see id.  5104(b), in default of which the Secretary of
Commerce can regulate directly, see id. 16 U.S.C.  5106.
    The March 1996 emergency regulations were designed to
fill the gap while a full-fledged FMP was developed by the
Commission and the Council responsible for scup, which is the Mid-
Atlantic Fishery Management Council ("Mid-Atlantic Council").  The
latter, in cooperation with the Commission, had proposed a scup FMP
in November 1995, but the Fisheries Service did not propose the
resulting regulation until June 1996.  After notice and comment,
regulations to implement the scup FMP were adopted by the Fisheries
Service in August 1996 and made effective on September 23, 1996,
when the emergency regulations expired.  See 61 Fed. Reg. 43420; 50
C.F.R.  648.1 et seq.
    The new permanent regulations imposed various scup
conservation measures including a moratorium on new entry into scup
fishing in the EEZ, permitting  and reporting requirements, gear
limitations, and exploitation schedules.  See 50 C.F.R.  648.4-
648.6, 648.14, 648.120-648.125.  The schedule for 1997 through 1999
permitted recovery of only 47 percent of the scup; this limit is
enforced by an annual coastwide commercial quota, to be expressed
by the Fisheries Service as a poundage limit for scup.  See 61 Fed.
Reg. 43420, 43426-27.  The regulations provided that the Atlantic
Commission and the Mid-Atlantic Council might refine the overall
quota--through further federal rulemaking--by use of vessel trip
limits, regional and "state-by-state" quotas, and subdivision of
the fishing year into segments.  See id.
    Federal action taken under this option to refine the
coastwide quota provoked the present litigation.  During early
1997, while the Fisheries Service was adopting a coastwide
commercial quota of 6 million pounds for 1997, the Atlantic
Commission and the Mid-Atlantic Council proposed an amendment to
subdivide the scup fishing year into segments, each with its own
quota, and for state-by-state quotas for the summer segment.  This
proposal, developed after extensive Council proceedings, was
published as a proposed regulation by the Fisheries Service in
February 1997 and offered for public comment.  See 62 Fed. Reg.
5375.
    The proposal--later adopted and challenged in part in the
district court--divided the scup quota into three seasons: a winter
I period, from January through April; a summer period, from May
through October, and a winter II period, for November and December.  
The percentages, based on historical shares as computed  from
existing data, were roughly 45 percent, 39 percent, and 16 percent
for winter I, summer, and winter II, respectively.  See 62 Fed.
Reg. 5375, 5378.  The winter quotas, largely captured offshore in
the EEZ by vessels from any of the states, were not further
subdivided.  See id.
    However, the summer quota, with which we are primarily
concerned, was further allocated among the states based on alleged
historical shares.  The great preponderance of this summer quota
was allocated for 1997 as follows:  Massachusetts (15.49% or
362,029 pounds), Rhode Island (60.57% or 1,415,425 pounds), and New
York (17.05% or 398,527 pounds).  See 62 Fed. Reg. 5375, 5378; 62
Fed. Reg. 27978, 27980.  The quota included fish caught within
state waters where much of the scup is harvested during the summer
months; and the proposal provided that any excess over quota landed
by a state's fishermen in one summer would be deducted from its
allocation in the following summer.  See 62 Fed. Reg. 5375, 5376.
    The Commonwealth and its fishery interests expressed
concern or opposition while the refined quota proposal was being
formulated by the Mid-Atlantic Council in the summer and fall of
1996 and during the federal-rulemaking comment period in February
and March 1997.  The Commonwealth did not oppose a seasonal quota.  
That measure tends to protect Massachusetts inshore fishermen from
the threat that, without the seasonal division, the scup quota
would be largely (or completely) recovered earlier in the year by
offshore vessels fishing further south before the scup reached
Massachusetts to spawn in the summer.
    However, for the state-by-state quota, the Commonwealth
said, among other things, that the historical data from which
shares were to be computed were inaccurate.  The proposal derived
the state-by-state allocation from a readily available federal
database of landings of scup and an array of other species in the
period 1983-92.  The Commonwealth said that these data tended to be
inclusive as to scup landings from large trawlers fishing offshore
and sold to big dealers but to undercount landings from fishing
inshore, especially in state waters in summer months, from smaller
vessels, weirs, and pots, often sold directly to retailers.
     The Commonwealth argued, based on some rough
approximations, that 80 percent or more of its summer scup harvest
came from inshore fishing, much of which was not included in the
database.  It made a brief effort to expand the database to include
the 1993-95 period, whose data could be more readily supplemented
by further inquiries, but it abandoned the effort when other states
protested that this would delay the program and cause other
problems.  Ultimately, the Commonwealth opposed the use of any
state-by-state quota for the summer until better data could be
acquired.
    Nevertheless, after receiving public comment, the
Fisheries Service adopted the proposed regulation including the
three-season quota and the state-by-state quota for the summer
season.  The final regulation was adopted with an effective date of
May 20, 1997.  See 62 Fed. Reg. 27978.  On June 19, 1997, the
Commonwealth brought the present action in the district court to
overturn the state-by-state quota.  Such a review action is
specifically provided for by the Magnuson-Stevens Act.  See 16
U.S.C.  1855(f).  For the 1997 summer season, the Commonwealth
simply did not enforce its quota against its fishermen.
    In the district court, the Secretary filed an
administrative record comprising primarily the minutes of the
meetings of the Mid-Atlantic Council, Federal Register notices of
the proposed and final regulations, and comments received from
public authorities and private interests.  The Commonwealth then
moved for judgment on the pleadings and also asked leave to offer
extra-record evidence to show that the historical data used
undercounted scup taken in Massachusetts.  The Secretary opposed
the new evidence and entered a cross motion for summary judgment.
    On April 27, 1998, just before the beginning of the 1998
summer catch period, the district court announced that it was
overturning the state-by-state quota, and on June 24, 1998, the
court released its written opinion.  Commonwealth v. Daley, 10 F.
Supp. 2d 74 (D. Mass. 1998).  Although the accompanying order
denied the Commonwealth's motion to add new evidence to the record,
the opinion granted  its motion for judgment on the pleadings.  The
decision forbad the Secretary to enforce the state-by-state quota
or to reduce the Massachusetts quota because of any overage and
directed the Secretary to promulgate a new regulation to replace
the flawed one.  See id. at 79.
    In a nutshell, the district court found that the
Fisheries Service had erred in basing the state-by-state quota on
historical data that it knew seriously undercounted Massachusetts'
past scup recoveries.  This undercounting, said the district court,
was established by the Fisheries Service's own data.  See Daley,  
F. Supp. 2d at 77-78.  Its use had produced a state-by-state
allocation of the summer quota that discriminated against
Massachusetts in violation of the statutory standard forbidding
FMPs from "discriminat[ing] between residents of different States."  
16 U.S.C.  1851(a)(4).
    The Secretary now appeals, saying that the district court
misunderstood the data and that the Fisheries Service used the best
data available to set the state-by-state quota.  The Commonwealth
says  that the Fisheries Service did not consider all pertinent
data and that the state-by-state quota is discriminatory.  The
problem, as we shall see, is that both sides may be right.
    We start with the legal framework that governs FMPs and
the implementing regulations.  The Magnuson-Stevens Act's main
thrust is to conserve the fisheries as a continuing resource
through a mixed federal-state regime; the FMPs are proposed by
state Councils but the final regulations are promulgated by the
Secretary through the Fisheries Service.  And both the FMPs and the
regulations have multiple goals: the provision that describes their
content, 16 U.S.C.  1853, sets out  specific requirements and says
that they must be "consistent with the national standards" set
forth in an earlier section, id.  1853(a)(1)(C).   
    The first of the specific requirements, 16 U.S.C.  
1853(a)(1)(A), is that the FMPs and regulations "contain the
conservation and management measures"  that are
    necessary and appropriate for the conservation
    and management of the fishery, to prevent
    overfishing and rebuild overfished stocks, and
    to protect, restore, and promote the long-term
    health and stability of the fishery.
The third of the specific requirements is a cross-reference to the  
national standards, id.  1853(a)(1)(C), of which two are
immediately pertinent here: number two provides that the measures
must be based "upon the best scientific information available," id. 1851(a)(2), and number 4 says that the measures "shall not
discriminate between residents of different states."  It continues:
    If it becomes necessary to allocate or assign
    fishing privileges among various United States
    fishermen, such allocation shall be (A) fair
    and equitable to all such fishermen; (B)
    reasonably calculated to promote conservation;
    and (C) carried out in such manner that no
    particular individual, corporation, or other
    entity acquires an excessive share of such
    privileges.

Id.  1851(a)(4).

    On review, the district court was directed by 16 U.S.C.
1855(f)(1)(B) to test the Secretary's regulations under the
familiar standards of the Administrative Procedure Act, 5 U.S.C.  
701 et seq., which  allow agency actions to be overturned, inter
alia, for errors of law or where arbitrary and capricious, id.  
706(2)(A), (C).  The district court properly reviewed the
Secretary's decision on the administrative record.  We are in the
same position as the district court, nominally reviewing the
decision de novo but effectively reviewing the Secretary's action
under the APA.
    The Commonwealth concedes that scup stocks are "severely
depleted."  Letter from Coates to Rosenberg of Jan. 3, 1997, supra,
note 3.  For present purposes, it follows that the fishing  of scup
has to be reduced below existing levels and this means that
fishermen are going to get less scup.  (The Commonwealth earlier
urged a different solution but does not pursue this issue on
appeal.)  The division into seasonal quotas, and the use of a
state-by-state quota for the summer, are devices for sharing the
pain.  The broad issue before us is whether the latter quota--the
former helps Massachusetts and is not challenged--is based on the
"best scientific information available," avoids "discriminat[ion],"
and is "fair and equitable."  16 U.S.C.  1851(a)(2), (4).
    Both sides have assumed that discrimination between
states could be avoided, and equity satisfied, if the new quotas
roughly reflected actual historical shares, despite the fact that
the raw quantities of fish allowed for each state's fishermen would
necessarily be reduced.  For purposes of this case we accept this
undisputed premise.  This is not to say that anything more than an
overall coastwide quota was necessarily required.  But, to the
extent that the subsidiary quotas subdivided the catch further,
those quotas had to be consistent--so far as possible--with the
non-discrimination and equity concepts and to rely upon the best
scientific evidence available.
    The difficulty from the outset has been that the
available data do not permit a fully accurate historical allocation
between states.  The information used to create the quotas concerns
scup landed in the individual East Coast states for the period
1983-92.  As the Commonwealth argues, these figures well reflect
scup landings from larger vessels and sold to dealers but
undercount landings often sold to retailers from smaller vessels
closer inshore and from inshore methods such as weirs and pots.  
This view is sufficiently clear from the record, and so little
disputed by the Secretary, cf. 62 Fed. Reg. 27978, 27983, that we
take it as settled.  But the impact on Massachusetts is a quite
different question.
    Massachusetts says that it is the main victim of such
undercounting because it has traditionally relied on such inshore
scup fishing for most of its catch while other states have not.  On
this appeal, the Secretary says that the district court erred in so
finding because of its misunderstanding of the figures.  It turns
out--as the Commonwealth admits--that the district court wrongly
assumed that the Secretary's 1983-92 data used to establish the
quota included fish caught in the EEZ but excluded automatically
fish caught in state waters.
    But even though the 1983-92 data used for the quota did
not automatically exclude all fish caught in state waters, the
evidence is solid that the data tended to undercount fish not
caught by the larger trawlers and so disfavored states that caught
scup closer inshore by other means.  Massachusetts, compared to
other states whose fishermen rely primarily on large trawlers for
scup, is clearly disfavored but by what amount is unclear; much
more important, it is unclear by how much it is disfavored vis--
vis New York and Rhode Island, and this is all that matters so far
as the state-by-state quota is concerned.
    These three states represent practically all of the
summer quota (about 93 percent), and their respective shares would
not be much affected if the underreporting affected them all
equally.  The record data set forth immediately below suggests that
Massachusetts is somewhat more seriously affected than are the
other two states; and there is no supported finding to the contrary
by the Secretary.  But the extent of the bias is very hard to
assess (and therefore especially hard to correct); and the
impression of bias against Massachusetts might even be dispelled by
a more careful analysis by the Secretary.
    Two sets of 1983-92 data in the record bear directly on
this question: one (table 17 of the scup FMP) shows that even on
the faulty data, Massachusetts landed on average 80 percent or more
of its catch from state waters, admittedly an imperfect proxy for
the distortion embodied in the database but still suggestive; the
Rhode Island and New York figures are lower (in the 20-65 percent
range) while other states have minimal catches in state waters.  
The other set of data (table 13 of the scup FMP) shows that
Massachusetts, vis--vis the other two states, takes more of its
catch from smaller vessels, weirs, and pots.  
    Going further, Massachusetts asserts that the state-by-
state quota is greatly biased against it, pointing to the results
of the 1997 summer season.  There, ignoring its summer quota of
362,029 pounds, Massachusetts fishermen landed 1,428,183 pounds of
scup (its reporting of inshore catches is said to be more accurate
now because of the reporting requirements of the 1997 regulation).  
Rhode Island, with a quota of 1,415,425 pounds, caught only 398,880
pounds; and New York, where the quota was 398,527 pounds, caught
only 221,320 pounds.  See 63 Fed. Reg. 3498, 3479.  But--even if
this were part of the administrative record, which it is not--data
from this one season tells us very little.
    Scup apparently school to different locations in
different years, and perhaps favored Massachusetts in the last
summer or so.  Further, Massachusetts was ignoring the quota; it is
not clear that the other two states were ignoring it and they may
have constrained their own fishermen in various ways.  Nor do we
know to what extent the original underreporting problem has been
remedied in Massachusetts (by its own collection of data) but less
so in the other two states.  Such doubts are precisely why agency
decisions are normally based on evidence that the agency has
considered and not new untested information first offered on
judicial review.
    There is a further problem for Massachusetts even though
we accept from the 1983-92 tables discussed above that the state-
by-state quota is somewhat biased against it.  Admittedly, during
the Council proceedings and in the federal rulemaking, the
Commonwealth  complained about the distortion, and it pointed to
some evidence of its existence.  But apart from its abortive
suggestion that 1993-95 figures be added to the data, it never
pressed on the Mid-Atlantic Council or the Secretary an alternative
set of figures for a state-by-state quota or claimed that any
method currently available could correct the existing distortion.
    To this extent the Commonwealth has forfeited any claim
that the Secretary failed to use the best scientific information
available.  If no one proposed anything better, then what is
available is the best.  Indeed, the Secretary specifically built
into the final regulation an opportunity for Massachusetts to
update the data for the quota by collecting data--some sources are
apparently still available--to show that its summer catches in the
1983-92 period were greater than reported; and the Commonwealth is
apparently engaged in that effort.
    Thus, when the Commonwealth says that the Secretary
"ignored" data in the record, it is referring not to a better
database that it proffered but merely to information showing that
the existing database is flawed.  Its real argument is that no
state-by-state quota is better than a flawed one, at least until
better data are developed.  Thus, the now narrowed question before
us is whether the Secretary's present state-by-state quota can be
justified under the statute--as reflecting the best data currently
available--even though distortions in the database seemingly create
some discrimination (impossible to quantify accurately) against
Massachusetts fishermen.
    If the state-by-state quotas were shown to be necessary
to achieve the main conservation goal, we would decide the case in
favor of the Secretary.  The Commonwealth could still urge that the
statute flatly forbids discrimination and inequity, regardless of
what happens to the fish; the statute says that each FMP and
regulation "shall" conform to the national standards and could be
taken to mean that each national standard must be fully and
absolutely met in every case, even though some are potentially in
tension with others.
    However, if there were an actual conflict in statutory
mandates, respect for Congress' overriding purpose would require
that the fishery be preserved despite some discrimination or
inequity.  After all, destruction of the fishery would make
meaningless any notions of fair allocation, while preserving the
fishery permits the quotas to be improved over time and perhaps
eliminated eventually.  Given an internal conflict in the statute's
mandates, the job of the courts and the administrator is to
implement the central aim of the statute.  It is hard to find much
case law directly in point, but what exists supports our approach.  
    But it is far less clear that there is yet a proven
conflict in mandates in this case.  The most troublesome fact for
the Secretary is that very little appears, whether in the Council
minutes or in the public comments or in the Secretary's notices, to
explain why the state-by-state quota is necessary at all.  The
state-by-state quota seems to have been adopted by the Secretary,
as part of the overall summer quota, with almost no explicitexplanation for its purpose by the Secretary.  Even the Secretary's
brief in this court, which is not a substitute for  analysis by the
Secretary, is almost silent on this issue, although the Secretary's
counsel did address it in oral argument.
    The most "obvious" reason for a state-by-state quota--
which becomes far less obvious on closer examination--is to prevent
discrimination between the states during the summer.  This
rationale is scarcely hinted at in the administrative record.  In
a statement outside this record, Rhode Island argued this rationale
to the district court, saying that the quota would protect
Massachusetts (since the fish swim from south to north in the
beginning of the summer), but the Commonwealth disclaims this
protection, probably calculating that the theoretical benefit is
outweighed by the very small quota allowed to Massachusetts.  In
any event, on this record, the state-by-state quota, based as it is
on incomplete data, appears to threaten more discrimination than it
avoids.
    At oral argument, the Secretary's counsel suggested
another reason for the state-by-state quota.  The states continue
to regulate fishing in in-state waters and counsel said that the
state-by-state quota permits each state to structure its local
regulation to allocate the diminished scup catch among various
groups of fishermen (e.g., weirs versus pots versus small boats).  
Perhaps a fixed quota for the individual state would help this
effort (or perhaps not), but only a thin scrap of information in
the record, and no findings by the Secretary, supports this
explanation for the quota.
    The last possibility, also argued by the Secretary's
counsel, is that the state-by-state quota is integral to the
enforcement of the overall summer quota.  Because so much of the
summer catch comes from state waters, there is no built-in federal
enforcement regime.  Instead,  the states are expected to enforce
their own summer quotas, apparently supplementing federal figures
as to the catch with state ones that more fully reflect the inshore
catch.  See 50 C.F.R. 648.121(b) (summer closures based in part on
state data).  The bite is in the provision of the regulation, 50
C.F.R.  648.120(d)(6), that subtracts the overage in one summer
from the state's quota in the following year (Massachusetts' 1997
overage exceeded its 1998 and 1999 quota combined).
    There are two problems with this rationale, plausible
though it may be.  The first is that nothing we can find in the
record directly supports it, nor has the Secretary explicitly
adopted it, so we cannot uphold the state-by-state quota on this
basis.  See SEC v. Chenery Corp., 318 U.S. 80, 89-90 (1943).  The
second is that even if the state-by-state quota was conducive to
enforcement, the present state-by-state quota still appears to
discriminate; to sustain it might well require that there be no
adequate alternative means of enforcement.  If adequate
conservation and non-discrimination could be achieved, it might be
hard to explain why the latter standard had to be sacrificed.
    We appreciate that the balancing of conflicting
objectives is primarily  for the Secretary;  his decision on this
issue, and even more so on the exigencies of enforcement, are
matters on which he enjoys great latitude.  See Heckler v. Chaney,
470 U.S. 821, 831-32 (1985); Commonwealth v. Secretary of
Agriculture, 984 F.2d 514, 521-22 (1st Cir.) cert. denied, 510 U.S.
822 (1993).  Further, the extent of existing discrimination against
Massachusetts is very uncertain and possibly findings by the
Secretary could diminish the major concerns that currently exist on
this score.  But those concerns do now exist, and the Secretary has
said nothing in his decision, and pointed to nothing in the record,
sufficient to overcome them.
    Where a regulation is not adequately supported, the
normal practice is to set it aside pending further proceedings.  
See Camp v. Pitts, 411 U.S. 138, 143 (1973).  That is our present
disposition, subject to anything we may learn on petition for
rehearing.  The alternative, a remand for further explanation while
leaving the regulation in force, see, e.g., Celcom Communications
Corp. v. FCC, 789 F.2d 67, 71 (D.C. Cir. 1986); Maine v. Kreps, 563
F.2d 1052 (1st Cir. 1977), is less attractive not only because of
the extreme impact on Massachusetts--a zero quota for summer 1999--
but also because the Secretary probably will need to reopen the
record in order to fill the gap by a permanent quota, if it can be
filled at all.
    Nevertheless, the Secretary retains power to issue
emergency regulations with a minimum of formalities.  See 16 U.S.C.
1855(c).  If a state-by-state quota is the only reasonable way to
make the overall summer quota effectively enforceable, nothing in
this opinion forecloses the Secretary from making such findings and
reinstituting some state-by-state quota on an emergency basis,
effective for this summer season starting in April.  Whether this
new regulation would survive on judicial review would depend very
much on just what the Secretary said and did, but a thorough
explanation in the record would go a long way to support such
action.
    Needless to say, any solution, interim or long term,
would be more secure if it reflected a common position arrived at
by the Secretary and the three states most concerned.  Assuming
that state-by-state quotas serve an important purpose, any  set of
numbers is going to be imperfect: the currently available data do
not provide anything like an exact mirror of the actual historical
shares.  Further, the whole structure of the statute, with its
unusual reliance on the state-dominated Councils, suggests
Congress' interest in negotiated solutions.
    While it has prevailed on this appeal, the Commonwealth
too has ample reason to seek a compromise on the quota issue.  The
Secretary retains his emergency power, considerable deference is
due to the Secretary's reasoned judgment, and we have rejected the
Commonwealth's best available information argument and ruled that
some measure of discrimination can be tolerated if essential to
achieve the statute's overall goal of preserving the fishery.  The
Commonwealth took a serious risk and prevailed; but it may not be
so fortunate next time.
    Accordingly, we affirm the judgment of the district court
with the explicit qualification that nothing in this opinion
precludes the adoption--subject always to swift judicial review--of
state-by-state quotas on an emergency basis, or through further
proceedings in the ordinary course, or both.  Each side will bear
its own costs on this appeal.
    It is so ordered.

</body>

</html>